GROSS COMMON CARRIER, INCORPORATED, Plaintiff–Appellant,

v.

BAXTER HEALTHCARE CORPORATION, doing business as Baxter Converter & Custom Sterile Pharma Seal, Defendant–Appellee.

No. 94–2256.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1994.

Decided April 3, 1995.

John W. Bryant (argued), Neill T. Riddell, Eames, Wilcox, Mastej, Bryant, Swift & Riddell, Detroit, MI, for plaintiff-appellant.

Paul Kozacky (argued), Kevin T. Conroy, McDermott, Will & Emery, Chicago, IL, for defendant-appellee.

Before COFFIN,* CUDAHY and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

The present case involves a controversy in the trucking industry. A bankrupt motor carrier, Gross Common Carrier, Inc., sued one of its former shippers, Baxter Healthcare Corporation, to recover monies allegedly owed under past shipping contracts. Whether Gross is entitled to recover for these "undercharges" depends on whether its contract with Baxter contemplated "contract carriage" or "common carriage." The district court found that the parties had anticipated contract carriage when they entered into an agreement to ship goods. Gross argues on appeal that its unilateral use of third party common carriers transformed its contract with Baxter into one for common carriage (entitling it to undercharges). We believe that a carrier lacks the power to unilaterally change the nature of an agreement for contract carriage. We therefore affirm the district court.

I.

Gross Common Carrier, Inc. (Gross) is a carrier authorized by the Interstate Commerce Commission (ICC) to engage in both common and contract carriage. In September of 1988, Gross entered into a transportation agreement with Baxter Healthcare Corporation (Baxter) to transport various hospital and medical-related items. The nature of that relationship is the subject of this dispute.

When Baxter accepted Gross's bid to ship its products, the parties entered into a one-year contract. The contract obligated Gross to perform transportation service for Baxter. Specifically, the contract stated that Gross was to provide transportation services "pursuant to [its] contract carrier permit No. MC 1494 Sub 35." Ex. A ¶ 2. The contract further prohibited Gross from hiring others on Baxter's behalf. Ex. A ¶ 8.

Gross in fact provided transportation services under this contract. During the first year of service, Gross moved over 2.4 million pounds of cargo for Baxter. Gross submitted a new rate proposal for the second year of service, which Baxter accepted and incorporated into the parties' agreement. Under the new rate, Gross again moved 2 million pounds of Baxter's cargo. The parties eventually extended the arrangement through September of 1991.

The district court found that performance was generally carried out as contemplated by the contract, with service involving over six million pounds of cargo and thousands of shipments. The district court further found that Gross charged the rates set forth in the parties' contract at all times, and that Baxter paid these rates. The arrangement eventually ended in August of 1991, when Gross discontinued its division specializing in less-than-truckload traffic and filed for bankruptcy.

Gross now alleges that Baxter owes it additional sums under the parties' shipping re-

---

* The Honorable Frank M. Coffin, Circuit Judge for the United States Court of Appeals for the First Circuit, is sitting by designation.

lationship. Gross's claim rests on arrangements that it occasionally made with third parties to ship Baxter's goods. From time to time, Gross would use joint line carriers to perform portions of the underlying transportation service. Gross now suggests that the fact that it followed this practice of interlining [1] with common carriers transforms its arrangement with Baxter from one of *contract carriage* to one of *common carriage*. Because common carriers are subject to rates contained in tariffs filed with the ICC, Gross suggests that these rates governed its relationship with Baxter. Consequently, it claims that Baxter owes it the difference between the amounts paid under the contract and the posted tariff rate at the time of service.

The district court rejected Gross's claim, granting summary judgment in favor of Baxter. It found that the contract between Gross and Baxter originally contemplated contract carriage, and that the contract prohibited Gross from hiring others on Baxter's behalf. In light of these factors, the district court believed that Gross lacked the power to unilaterally transform the nature of the contract into one of common carriage (and subsequently hold Baxter liable for undercharges). Because the court determined that Baxter was unaware of Gross's practice of interlining, it rejected Gross's claim. We affirm.

## II.

■ As an initial matter, we need to address a jurisdictional issue before reaching the merits of the parties' claims.[2] The Interstate Commerce Commission (ICC) has the statutory authority to resolve disputes concerning whether service was provided in a motor carrier's contract carriage or common carriage capacity. See 49 U.S.C. § 11101(d). The ICC has in fact resolved a number of these disputes. See generally In Re Rubbermaid, Inc., No. 40946, 1993 WL 407377, 1993 M.C.C. LEXIS 174 (I.C.C. Oct. 13, 1993); Ford Motor Co. v. Security Services, Inc., 9 I.C.C.2d 892, 1993 WL 326548, 1993 M.C.C. LEXIS 124 (Aug. 27, 1993). The ICC's authority in this area is not, however, exclusive. When granting the ICC the authority to resolve these disputes, Congress expressly preserved a federal court's jurisdiction in these matters. See Negotiated Rates Act of 1993, Pub.L. No. 103–180, § 9, 107 Stat. 2053. Congress thus contemplated that a federal court would determine, under the doctrine of primary jurisdiction, whether it or the ICC would examine in the first instance whether a given carrier performed in its contract or common carriage capacity.

■ The doctrine of primary jurisdiction envisages a fact-specific inquiry peculiar to the circumstances of each case. See United States v. Western Pacific Railroad Co., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); Ryan v. Chemlawn Corp., 935 F.2d 129, 130 (7th Cir.1991). In many circumstances, it might be wise for a district court to refer characterizations of the type of transportation provided to the ICC for resolution. See United Shipping Co., Inc. v. General Mills, Inc., 34 F.3d 1383 (8th Cir. 1994) (approving of bankruptcy court's referral of issue to ICC). In fact, a number of district courts have felt compelled to do so. See, e.g., Official Unsecured Creditors' Committee v. Consolidated Papers, 847 F.Supp. 651, 653 (W.D.Wis.1994) (holding that the ICC should "develop uniform law concerning the distinction between contract and common

---

1. "Interline" is a term of art involving the transfer of shipments from one motor carrier to another in order to effect a final delivery of the shipment in question.

2. Baxter additionally suggests that appellate jurisdiction is lacking in view of Gross's failure to timely file a notice of appeal. The district court entered judgment for Baxter on March 30, 1994. In order for Gross to timely appeal from this judgment, Gross needed to file a notice of appeal within 30 days after the date of the entry of the judgment. Fed.R.App.P. 4(a)(1). Gross in fact filed the notice on April 29, 1994, within the required time period. Gross apparently failed, however, to sign the check for the filing fee. Without detailing the procedural bungling that occurred in the district court, we note that the district court properly treated the notice of appeal as timely filed. See Fed.R.App.P. 3(a) (noting that "[f]ailure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal"); see also Note to Subdivision (e) (noting that "the failure to prepay the statutory filing fee does not constitute a jurisdictional defect").

carriage"); *North Penn Transfer, Inc. v. Victaulic Co. of America,* 859 F.Supp. 154, 160 (E.D.Penn.1994) (same). Whether deferral is mandated under the doctrine of primary jurisdiction, however, is an issue that we do not decide today.

■ In light of the positions taken in the lower court, the parties have waived or forfeited any concerns that we may have had about primary jurisdiction. In this respect, primary jurisdiction is quite different from subject matter jurisdiction. *Johnson v. Artim Transportation Sys., Inc.,* 826 F.2d 538, 548 (7th Cir.1987), *cert. denied,* 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988). It does not, for instance, concern a court's power to hear a case in the first instance. *Id.* Consequently, application of the doctrine of primary jurisdiction can be waived or forfeited by the parties. *Kendra Oil & Gas, Inc. v. Homco, Ltd.,* 879 F.2d 240, 242 (7th Cir.1989); *Johnson,* 826 F.2d at 547. This is true in the present case. Neither party urged the district court to refer the matter to the ICC, and neither do they raise this issue on appeal. To the contrary, both parties seem to have requested that the district court characterize the transportation provided under their contract. Under these circumstances, we conclude that the time for addressing concerns presented by the doctrine of primary jurisdiction has passed.[3]

## III.

On appeal, Gross attempts to take advantage of the "filed rate doctrine." The Interstate Commerce Act requires a motor common carrier to publish its rates in a tariff filed with the ICC. 49 U.S.C. § 10762 (1944). This published rate then governs the

legal relationship between the shipper and the carrier, ultimately forbidding equitable defenses to the collection of the filed tariff, such as the shipper's ignorance or the carrier's misquotation of rates. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 127, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990) (citing cases). Because of the filed rate doctrine, the trucking industry has seen a substantial amount of undercharge litigation, in which a carrier claims that a shipper is liable to it for the difference between the rate charged and the rate that it has published with the ICC. Despite the "harsh effects" that frequently result from application of this doctrine, courts have strictly applied it to avoid the vagaries of discrimination. *Maislin,* 497 U.S. at 127–28, 110 S.Ct. at 2766–67. The doctrine has been the very cornerstone of the anti-discrimination policy that has had such historic importance in the transportation industry.

■ The filed rate doctrine governs only *common* carriers, however. *Contract* carriers are now exempt from its strictures. *See Exemption of Motor Contract Carriers from Tariff Filing Requirements,* 133 M.C.C. 150 (1983), *aff'd, Central & Southern Motor Freight Tariff Ass'n, Inc. v. United States,* 757 F.2d 301 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The freedom accorded contract carriers was a change forged by the agency and later approved by Congress. *See Maislin,* 497 U.S. at 135, 110 S.Ct. at 2770–71 (discussing congressional approval of the exemption provided for contract carriers). The current regulatory regime thus envisions markedly different standards for policing the activities of the two types of carriers. A common carrier must hold out its services

---

**3.** We do not wish to suggest that parties may always consensually decide to forgo concerns about primary jurisdiction. *See, e.g., Johnson,* 826 F.2d at 548 (holding that a district court's failure to address the doctrine may in some circumstances be plain error). There may, for instance, be cases in which an agency's interpretation of a rule or regulation is indispensable to a court's determination. *Id.* (quoting *City of Peoria v. General Electric Cablevision Corp.,* 690 F.2d 116, 120–21 (7th Cir.1982)). This is not such a case, however. The ICC's standards for differentiating between common and contract carriage are perfectly clear. *See Atlantis Express, Inc. v.*

*Standard Transportation Services, Inc.,* 955 F.2d 529, 534 (8th Cir.1991) (holding referral to ICC proper where agency's standard for differentiating between contract and common carriage was ambiguous). And we address a purely legal concern about the effect of a contract carrier's interlining. *See Goya Foods, Inc. v. Tropicana Products, Inc.,* 846 F.2d 848, 851 (2d Cir.1988) (noting that "application of the doctrine has been refused when the issue at stake is legal in nature and lies within the traditional realm of judicial competence"). The agency has provided guidance enough on the relevant standards to enable us to make this determination.

indiscriminately to all shippers and adhere to the transportation rate it publishes with the ICC. Any departure from this published rate results in the possible application of various penalties for both carrier and shipper (such as subjecting a shipper to a later claim for undercharges). Acting as a contract carrier, on the other hand, enables a carrier to negotiate individual agreements or contracts.

More pointedly, though, the amount of freedom a particular carrier enjoys depends upon the capacity in which it acts. The Motor Carriers Act of 1980 (MCA) enables carriers to engage in dual operations. Pub.L. No. 96–296, § 10(b)(1), 94 Stat. 793, *amending* 49 U.S.C. § 10930(a). Under the changes forged by the MCA, a carrier can now operate as *both* a common carrier and a contract carrier. This change proved momentous for the filed rate doctrine. Because the filed rate doctrine governs only common carriage, how particular transportation is characterized ultimately determines whether a shipper is potentially liable for undercharges.

The ICC resorts to a three-pronged test to characterize the type of carriage provided by a carrier to a particular shipper. *See generally Ford Motor Co. v. Security Services, Inc.*, 1993 WL 326548, 1993 M.C.C. Lexis 124, at *5. Contract carriage exists if each of the following factors was present in the parties' relationship at the time of contracting: 1) a carrier held appropriate contract carrier authority to provide the service; 2) the shipper and the carrier reached an agreement that the transportation to be provided was to be contract carriage; and 3) the shipments moved under the parties' agreement in a manner consistent with the statutory definition of contract carriage. *Id.* The statutory definition of contract carriage requires that a shipment move under a "continuing agreement" and that the transportation services be designed to meet the "distinct needs" of the shipper. 49 U.S.C. § 10102(15). A determination that transpor-

tation is contract carriage renders the filed rate doctrine inapplicable.

The district court found that these factors were satisfied here and that the parties' relationship was one of contract carriage. 851 F.Supp. at 317. Gross had the authority to provide contract carriage. Gross and Baxter had entered into a written contract which specified that Gross was to provide transportation pursuant to its contract carrier authority, and Gross and Baxter had renewed this contract on a yearly basis. In addition, the shipments that Gross transported for Baxter moved under this "continuing agreement" that was designed to meet Baxter's "distinct needs."

█ Gross does not dispute these factual findings on appeal. Indeed, it apparently concedes that it agreed to transport Baxter's cargo pursuant to its contract carriage authority. As best we can tell from its brief, Gross seems to argue that the above factors are not material in light of its practice of interlining some of the shipments.[4] Gross periodically used third party common carriers to move some of the shipments that it was obligated to transport for Baxter. It claims that this practice of interlining, which traditional transportation law prohibits contract carriers from engaging in, "reconstituted" the service it provided as common carrier service. It suggests that the undisputed existence of the interlined shipments, without more, entitles it to the undercharges that it claims under the filed rate doctrine. Alternatively, Gross argues that Baxter knew and approved of the practice of interlining, and that this knowledge altered the nature of the parties' contract. We do not find either of these arguments persuasive.

In support of its argument urging recharacterization of the parties' contract, Gross relies upon a time-worn principle of the transportation industry. In *Holmes Contract Carrier Application*, 8 M.C.C. 391, 393 (1938), the ICC stated:

---

4. Gross does not expressly contest any of the district court's conclusions under the ICC's test for contract carriage. Instead, Gross states "[e]ven though both parties may have intended that the service in question would be contract

carrier service, the decisional law of the ICC [concerning interlining and the filed rate doctrine] holds that the service was common carriage." Appellant's Br. at 20.

If interstate ... shipments are interchanged with common carriers, the transportation service is that of a common carrier and not a contract carrier, and a contract carrier may not engage in such interchange without first changing its status to that of a common carrier.

*Id.; see also Pappas Contract Carrier Application,* 20 M.C.C. 429, 430 (1939) (holding that "[i]f shipments in interstate or foreign commerce are interchanged with common carriers, the transportation service is that of a common carrier"). The ICC may well adhere to the continuing vitality of this principle. *See Rubbermaid,* 1993 WL 407377, 1993 M.C.C. Lexis 174, at *21 n. 19 (simply restating the principle).

At the present time, however, the principle's role in motor carrier regulation is unclear. As the ICC itself has noted, "the transportation landscape has changed." *Petition for Rulemaking—Interlining by Motor Contract Carriers,* No. MC–214, at 2 (I.C.C. Dec. 16, 1994). In 1980, the MCA removed restrictions on the dual operation of carriers, enabling one carrier to operate as both a common carrier and a contract carrier.[5] Licenses to operate in this dual capacity are now routinely granted, and "[m]ost carriers have nationwide common and contract carrier authority." *Id.* These changes represent a movement from a regime emphasizing regulation and protectionist in its impacts to a system that favors—and consequently fosters—competition. The prohibition against a contract carrier's interlining, on the other hand, was originally conceived as a means of protecting common carriers from competition by contract carriers. *See, e.g., In re Trailer Bridge, Inc.,* 1992 WL 220557, 1992 I.C.C. Lexis 190, at *14 (Sept. 3, 1992). One might therefore question the vitality of the prohibition on interlining. The ICC itself has gone so far as to suggest that in light of the transportation options at a motor carrier's disposal, concerns about the threat of undercharge liability arising from the practice of interlining are moot. *Petition for Rulemaking on Interlining,* No. MC–214, at 3.

But even if the ICC still fully recognizes this limitation on the activities in which a contract carrier can engage, Gross's argument must fail. To state a limitation on action is not to prescribe the repercussions of a violation of that limitation. Put another way, it may be that contract carriers should not engage in the practice of interlining; but a simple statement of this rule fails to tell us what happens when they do. *See Ford,* 1993 WL 326548, 1993 M.C.C. Lexis 124, at *36 (discussing the various statutory ways to challenge alleged violations of the ICC's regulatory or statutory requirements).

Gross has come forward with no authority suggesting that a violation of this principle provides a basis for voiding an otherwise valid agreement for contract carriage. Indeed, the ICC's various statements on contract carriage convince us that the opposite is true. The ICC has communicated its unwillingness to recognize a retroactive determination that a valid contract carrier relationship ought to be recharacterized as one of common carriage:

... if there is a contract carrier relationship ... there is no statutory basis for this Commission, the parties, or their successors-in-interest, to remedy any actual or asserted deficiencies or breaches of the contract or performance thereunder by voiding the contract carrier relationship and retroactively treating the transportation as that of a motor common carrier.

. . . . .

We find nothing to support the view that Congress intended that contract carriage should be invalidated, and that common carrier tariffs should be applied retroactively, simply because a contract carrier may have failed to comply with the ICA or regulations promulgated under it.

*Ford,* 1993 WL 326548, 1993 M.C.C. Lexis 124, at **5, 28. Because the ICC refuses to recognize retroactive invalidation of a contract carriage relationship, we will not undertake such an invalidation here.

---

5. Specifically, Congress removed the requirement for a special finding approving of a dual holding of both contract and common carrier authority. Motor Carriers Act of 1980, Pub.L. No. 96–296, § 10(b)(1), 94 Stat. 793, *amending* 49 U.S.C. § 10930(a).

We believe that once the parties have established a legitimate contract carrier relationship, the shipper is entitled to rely on that relationship without risking a later claim for undercharges because of the carrier's unilateral conduct. *Ford*, 1993 WL 326548, 1993 M.C.C. LEXIS 124, at *8 ("Once the parties ... have clearly established that certain transportation is to move under the contract carrier permit, the shipper is entitled to rely on the carrier lawfully to transport it under the permit ..."); *Rubbermaid*, 1993 WL 407377, 1993 M.C.C. LEXIS 174, at *30 ("Once a carrier with a contract carrier permit has agreed to provide contract carrier service to a shipper which is within the scope of service authorized by its permit, that carrier is legally obligated to provide that service."). Here, the contract between Baxter and Gross was not altered by Gross's practice of interlining. Because Baxter and Gross had a valid relationship for contract carriage, and because the shipments at issue moved pursuant to that relationship, application of the filed rate doctrine is unwarranted.[6]

██ Gross's allegation that Baxter was aware of the practice of interlining does not alter our conclusion.[7] In support of Baxter's supposed knowledge, Gross points to two sets of documents. First, Gross claims that the general language on Baxter's standard form bills of lading authorized the practice of interlining. Second, it suggests that its own freight billings contained alpha-numeric notations that indicated its practice of interlining.

Gross contends that the freight billings, which were received by Baxter's shipping clerks, demonstrate Baxter's awareness of its practice of interlining.

██ The general language of a standard form bill of lading is not sufficient to cast doubt on unambiguous contract provisions.[8] If the pertinent provisions of a contract are unambiguous, a court need not examine extrinsic evidence to determine the contract's meaning. *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir.1989). Here, the parties clearly contemplated that the shipments would move under contract carriage. The contract specifies as much. It expressly states that "Services under this Agreement are to be provided pursuant to Carrier's contract carrier permit...." Ex. A ¶ 2. It further prohibits Gross from hiring others on Baxter's behalf. Ex. A ¶ 8. Gross in fact comes forward with no evidence of a contrary intention. Gross admits that it "told Baxter that Gross would transport Baxter's cargo pursuant to its contract carriage authority with the ICC." Pl.Resp. ¶ 4. And it admits that it agreed to provide transportation in its contract carrier capacity. Pl. Resp. ¶ 7. Under these circumstances, Gross's proffer of the bills of lading was insufficient to create a "genuine" factual dispute. *See Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1212 (7th Cir. 1993).

Neither do we believe that the notations contained in the freight billings suffice to

---

6. Because we conclude that a valid agreement for contract carriage existed between the parties, Gross's attempt to rely on principles developed under the filed rate doctrine is misplaced. *See, e.g., Reiter v. Cooper*, —— U.S. ——, ——, 113 S.Ct. 1213, 1219, 122 L.Ed.2d 604 (1993) (noting that a shipper cannot avoid the filed rate by invoking a "prior agreement to a different rate," but that "claims and defenses that are specifically accorded by the ICA itself" may be asserted).

7. Baxter argues that Gross has waived consideration of its claimed questions of fact relating to Baxter's knowledge of interlining in light of Gross's failure to submit a Rule 12(n) statement in opposition to the motion for summary judgment. *See, e.g., Capitol Converting Equipment v. LEP Transport*, 965 F.2d 391, 394 (7th Cir.1992). Gross fairly contested the facts that Baxter set forth, however, when it submitted affidavits and

other evidentiary materials. Because Baxter presented these materials to the district court, and that court considered them in granting summary judgment, we are free to review them on appeal. *See Henn v. National Geographic Soc'y*, 819 F.2d 824, 831 (7th Cir.), *cert. denied*, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987).

8. The language of the bill of lading that Gross claims authorizes interlining states that the carrier's obligation is "to carry [the property] to its usual place of delivery at * * * destination, if on its route, otherwise to deliver to another carrier on the route to said destination." The Uniform Domestic Straight Bill of Lading also provides that "every carrier shall have the right, in case of physical necessity, to forward said property by any carrier or route between the point of shipment and the point of destination."

render summary judgment inappropriate. Gross suggests that these notations, familiar to everyone in the industry, provided Baxter with affirmative notice of the practice of interlining. At most, however, we believe that these documents (ordinarily handled by shipping clerks) may have given Baxter constructive knowledge of Gross's practice. Gross has not pointed to the legal relevance—if any—of a shipper's constructive knowledge that a contract carrier was periodically engaging in the practice of interlining. Gross's argument seems to confuse *knowledge* with *consent.* But knowledge of, or even passive acquiescence in, a particular behavior does not necessarily amount to consent to that behavior—particularly when an unambiguous contract provision specifies otherwise. Perhaps Baxter was not policing Gross's activities as diligently as it should, but this should hardly provide a basis for Gross to seek additional payment under the contract. *See, e.g., Ford,* 1993 WL 326548, 1993 M.C.C. Lexis 124, at *58 ("If a contract was formed, but then breached, this may give rise to a remedy for breach of the contract carrier contract, but it would not cause the tariffs applicable to a common carrier to control.").[9] We fail to find a shipper's constructive knowledge of a carrier's interlining legally significant. The notations on the freight billings therefore provided no bar to summary judgment. *See Anweiler v. American Elec. Power Corp.,* 3 F.3d 986, 990 (7th Cir.1993) (summary judgment appropriate if the alleged factual dispute does not affect the outcome of the case under governing law).

The evidence upon which Gross relies is insufficient to alter the nature of the contract or cause us to question Baxter's belief that its shipments would proceed under contract carriage. As noted in *Ford,* a "contract carrier relationship is established when the parties concur that the transportation is to be provided under a carrier's contract authority, the parties enter into an agreement for motor carrier services, and each party relies

upon the agreement in tendering and transporting the traffic." 1993 WL 326548, 1993 M.C.C. Lexis 124, at *5.

## IV.

It is not disputed that the parties agreed to contract carriage here. They entered into a perfectly clear contract to that effect. Gross has not come forward with evidence sufficient to cast doubt upon the nature of that contract, or to suggest that Baxter ever intended different arrangements. Even assuming clearer evidence of Baxter's knowledge of interlining, however, the import of that knowledge would be quite uncertain in light of the change in the regulatory climate of the transportation industry.

The district court's decision to grant summary judgment in favor of Baxter is therefore

AFFIRMED.

---

9. Gross does not argue that whatever level of knowledge these documents show constitutes a modification or renegotiation of the parties' original agreement. We are not certain, in any event, *what* a party would need to allege in order to demonstrate a subsequent modification of a valid agreement for contract carriage. *Ford* itself examines considerations motivating the par-

ties at the *time of contracting. Ford,* 1993 WL 326548, 1993 M.C.C. Lexis 124, at *5.